**UNITED STATES of America, Plaintiff,**

**v.**

**Dwight Eugene JACKSON, Defendant.**

**No. 86 CR 426.**

United States District Court,
N.D. Illinois, E.D.

Oct. 7, 1991.

MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Dwight Eugene Jackson moves for reduction of sentence.

On January 2, 1987, a jury convicted Mr. Jackson on each of the following three counts: Count I, Bank Robbery (18 U.S.C. 2113(a) & (d)); Count II, use of a firearm during the commission of a crime of violence (18 U.S.C. 924(c)); and Count III, being an armed career criminal in possession of a firearm (18 U.S.C.App. II 1202(a), repealed in part in 1986). On February 18, 1987, this court sentenced Mr. Jackson to consecutive sentences, running in the following order: 25 years on Count One; imprisonment without parole on Count Three; and 5 years on Count Two.

On appeal, the 7th Circuit found that this sentence, being within the statutory range, was "essentially free of appellate review." *United States v. Jackson*, 835 F.2d 1195, 1197 (7th Cir.1987). The court further noted that Mr. Jackson was a career criminal, that specific deterrence had failed, and that this court was entitled to consider general deterrence and incapacitation in deciding upon an appropriate sentence.

The 7th Circuit also ruled that the statute pursuant to which this court imposed a

sentence of life imprisonment, 18 U.S.C.App. § 1202, reflects a "judgment that career criminals who persist in possessing weapons should be dealt with more severely." *Id.* at 1197. Although the Sentencing Commission Guidelines did not apply, the court noted that if they did, "a criminal such as Jackson should receive 27 years without possibility of parole at the minimum and life without possibility of parole at the maximum." *Id.*

The majority opinion written by Judge Easterbrook does not say that the sentence is unduly harsh, but speculates that if it is, "the holder of the clemency power may supply a remedy." *Id.* The instant motion calls upon this court, under Fed.R.Crim.P. 35, to make that determination under judicial authority, which it has, and not under clemency power, which it has not. For fifteen years, since 1976, this court has had, in one venue or another, the awesome responsibility of sentencing, and of frequently depriving of freedom, fellow citizens. Through that period of time, the court estimates it has dealt with the conviction and sentencing of over 2,000 persons. There is no responsibility in this life which this court throughout this experience has considered more carefully, even more prayerfully.

The sentence imposed here was rendered after deep and profound consideration of many elements. And yet, this court has delayed resolution of Mr. Jackson's motion for months in order to gain perspective. In some respects, the delay itself may seem untoward, since the defendant, incarcerated without hope of parole, may and undoubtedly does yearn for an early and affirmative response. Nonetheless, the re-evaluation under the law and under justice requires a thoughtful and dispassionate treatment.

The court reviews here its decision, the transcript of the sentencing hearing, Mr. Jackson's motion, the majority opinion of the 7th Circuit, and the concurring opinion of Judge Posner. It has been necessary to examine every element of the decision, including a self-examination of the quality of justice and judgment reflected in the court's decision. Self-justification would be irrelevant and inappropriate. Equally, failure to deal adequately with all expressions on the appropriateness of this sentence would be itself inappropriate.

In ruling on the motion the court reviews the sentence with the utmost seriousness in light of the fact that it is a most severe sentence, the most severe ever administered by this court. Because serious examination is required, even unavoidable, in light of the harsh approbation of the concurrence to the Seventh Circuit opinion affirming the sentence imposed on Mr. Jackson. Mr. Jackson relies heavily upon that concurrence in his motion. The court's respect for the opinions of Judge Posner is real; it feels constrained to give full consideration to his criticism of the court's "savage[ry]" and of the court's affront to the norms of a "civilized society". *Id.* at 1199, 1200.

The petitioner proposes first the principal of proportionality and relies primarily on the enumerated objective criteria of *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

The first of these is the gravity of the offense and the harshness of the penalty. The court agrees that this sentence is very harsh; the petitioner argues that the sentence is significantly disproportionate to his crime. The petitioner in supporting this position quotes the concurring opinion, "I do not mean to denigrate the gravity of his offense by pointing out that he has never inflicted a physical injury," *Id.* at 1198, and so claims his conduct does not warrant the severity of the sentence. This court, however, discussed at length the danger which Mr. Jackson posed to society and even to himself, in light of his refusal to modify his conduct. See transcript, pp. 1524–1525.

The second of the *Solem* criteria is the severity of sentences imposed on other criminals in the same jurisdiction. Again, the petitioner quotes the concurring opinion which, citing *United States v. Fountain,* 768 F.2d 790, 799–800 (7th Cir.1985), states:

"Few murderers, traitors, or rapists are punished so severely—a good example

being life sentences with parole eligibility imposed on two federal prisoners for first degree murder, each having previously murdered three people." 835 F.2d at 1198–99.

What the petitioner and Judge Posner do not mention is that the prisoners in *Fountain* are already serving three life sentences for murder and that the trial judge tried to sentence them to a term of years (50 to 150) for which the statute did not provide, in order to avoid the statutorily mandated parole eligibility available after ten years.

Additionally, the petitioner cites a different statute, 18 U.S.C. Section 3575 (since repealed), which permits sentencing a "dangerous special offender" to a term not to exceed twenty-five years with possible parole. The petitioner does not, however, point out that the twenty-five year sentence could have been consecutive to his other sentences. Petitioner also cites lesser sentences for some serious offenses, but never recounts the additional circumstances of those cases which every trial judge and trial lawyer knows are considered in criminal cases.

The petitioner also refers to other sentences imposed under the Armed Career Criminal statute which were treated by the trial court and the affirmance by the Seventh Circuit in this case. The sentences in those cases ranged from fifteen to twenty-five years, but again there is no indication of circumstances comparable to this petitioner's record of crime. (The court notes that of those sentences cited, none would lead to Mr. Jackson's release before he reached at least the age of sixty-five.)

Mr. Jackson was 36 years old when this court sentenced him, but thirty-five at the time he committed his last bank-robbery. He was arrested and continuously incarcerated from that day—his sentence thus runs from the time he was thirty-five. Count 2, which charged the use of a firearm during the commission of a crime of violence carries a *mandatory* five year, consecutive sentence without possibility of parole, 18 U.S.C. § 924(c). The court sentenced Mr. Jackson to 25 years on Count 1, the bank robbery, and Mr. Jackson has not challenged that portion of his sentence. Thus, even if the court had sentenced Mr. Jackson to a concurrent sentence of 25 years on the Armed Career Criminal count (the statute required that the court impose a sentence of imprisonment of not less than 15 years, with no possibility of parole) he would nonetheless be facing jail until his sixty-fifth birthday. If the sentence on Count 3 were made consecutive, Mr. Jackson would not be released until he was 90 years old. Even the sentence suggested by Judge Posner, 20 years in prison with no possibility of parole on the bank robbery count, would, in combination with the mandatory additional five years on Count 2 and a concurrent sentence on Count 3, prevent Mr. Jackson's release until he reached the age of sixty.[1]

The concurring opinion cites the confidential sentencing recommendation of the probation officer (which was not a part of the court record, and was given to the higher court in violation of the local court rule which at the time called for a mandatory citation of contempt). The concurrence states that the probation officer recommended a sentence of 10 years. In fact, he

---

1. Judge Posner's opinion is not entirely clear on this point. His statement regarding what he believed to be the appropriate sentence is somewhat ambiguous:

> We should ask how many 35 year olds would rob a bank if they knew that if they were caught it would mean 20 years in prison with no possibility of parole (the sentence I would have given Jackson if I had been the sentencing judge) compared to the number who would do so if it would mean life in prison.

Judge Posner may be referring only to the sentence on the bank robbery count (this court sentenced Mr. Jackson to 25 years on that count), since he is in this passage discussing deterring other would-be bank robbers. But bank robbery was only one of the crimes for which this court sentenced Mr. Jackson. His sentence also included the mandatory five-year, consecutive sentence for using a gun during the bank robbery and the sentence he seeks review of here, for being an armed career criminal. Judge Posner has not accounted for the inclusion of the three crimes in his sentencing suggestion.

recommended 30, and this without any reference to the three special sentencing provisions in issue in this case. Indeed, the probation officer's parole prognosis demonstrates that he was not aware of the mandatory minimums without possibility of parole imposed by two of the three statutes. It is not to deprecate that report to suggest it was given the consideration which it deserved and that the court relied most on the factual, rather than legal statements contained within it.

It is worth noting that the non-confidential parts of this recommendation which Judge Posner ordered to be delivered to him also include a number of relevant comments including:

1. The defendant continued to deny his guilt to the probation officer even after his conviction, arguing that the charges were trumped up and federal officials in charge of his case were conspiring against him.

2. In addition to his seven armed robbery convictions, he had attempted to murder his army colonel in Vietnam, and assaulted a sergeant. He had been convicted in the army of possession of drugs. He admitted to additional possession of drugs, and he was charged with an additional armed bank robbery which charge was dismissed.

3. The report supplements a finding by Judge Grady in a prior sentencing and notes that the Judge's comments were extremely important when he wrote: "It is entirely fortuitous that no one other than the defendant was injured in this escapade.... He shows no remorse.... The odds of his succeeding on parole are obviously poor. I would recommend against parole unless there is some fairly objective evidence of it and it is difficult to foresee what that evidence would be."

4. The defendant was unable to clearly respond when asked what he would have done if he was confronted by a bank guard with his pistol drawn.

5. His record reflects the use of violence and force in perpetrating criminal acts.

6. The defendant is a *hard-core recidivist* and poses a *direct threat* to the safety and welfare of the community. If the defendant is given his freedom anytime soon, there is a distinct possibility that further involvement in illegal activity *might result in severe injury or death to some individual ........ not amenable to any psychotherapy or any similar rehabilitation program.*

7. He should be maintained in custody and not be released for any reason (during the term of his sentence).

8. The court should be concerned with *deterrence and punishment.*

The memorandum in support of this motion for correction of sentence or for reduction of sentence, after dealing with the argument on proportionality then emphasizes the concurring opinion. It attaches as well a copy of the petition for certiorari denied by the Supreme Court which indulges primarily the same two emphases. It is then appropriate for this court to consider more fully the argument if not the analysis of the opinion.

Judge Posner has reflected on the fact that effective appellate Judges carefully select their facts and martial their rhetoric to support their goals. Posner, *Cardozo: A Study in Reputation* at 55 (The University of Chicago Press, 1990). ("It is not the *invariable* practice of appellate judges to slant the facts in favor of the outcome, although goodness knows it is common.") His concurring opinion in this matter reflects that proposition.

 The concurring opinion agrees with this court that "Jackson is unquestionably a dangerous and hardened criminal." 835 F.2d at 1198. This court respectfully agrees with the concurring opinion's remark that the fact that no one was hurt "is relevant to deciding whether the sheer enormity of his conduct warrants imprisonment for the rest of his life as a matter of retributive justice." *Id.* The court agrees that fact is relevant and recognizes the thesis that Mr. Jackson's conduct does not warrant life imprisonment solely as a matter of retributive justice. "It does not,"

says Judge Posner and this court certainly agrees.[2]

The concurring opinion surprisingly asserts, on the other hand, that the District Court articulated only one ground for sentence, the need to prevent Jackson from committing further crimes. *Id.* at 1199. Any reading of the sentencing transcript clearly reveals that this is not accurate. (See Appendix attached to this opinion).

Judge Posner's independent research notes that "in 1986 more than 62% of all persons arrested for robbery (any sort of robbery—I can find no breakdown (continues Judge Posner) by type of robbery) were below the ages of 25 and only 3.4% were 60 years old or older." *Id.* From this, Judge Posner suggests that this criminal defendant would probably not commit a bank robbery at age 55 after completion of Judge Posner's suggested sentence of twenty years. (That sentence, as this court has noted above, is the absolute minimum to which this unrepentant, "dangerous and hardened criminal" could be sentenced).

Judge Posner does not consider whether strong arm robberies are more frequent than armed robberies, or whether older persons more frequently 'snatch and run', or physically roll their victims, or beat them, etc. than do younger, stronger, quicker men. Nor do the statistics offered suggest whether there are fewer recidivists on the streets because more of them are in jail in their later years. The Judge suspects that bank robbery is more of a young man's crime than an old man's crime because a bank robber must be wiling to confront armed guards and able to make a quick getaway. *Id.* at 1199. Well, a gun helps any robber, young or old, and a car helps any robber, young or old, but either a gun or a car tolerates the strong possibility of victims. It would appear that the Judge has never heard of the most famous bank robber of our time, the nefarious Willie Sutton, who when asked, in his seventies, why he continued to rob banks, replied "Because that's where the money is."

The concurring opinion suggests that the risk that Mr. Jackson will commit another robbery in his 70's or 80's is too speculative here to warrant imprisonment until the defendant dies of old age. *Id.* at 1199. One wonders whether, in true justice, we should speculate equally whether, if released, the man would eventually kill somebody. Which of these speculations on these facts is the wiser course? We cannot make this choice without conscience, and we certainly cannot do it savagely.

The concurring opinion amazingly brings Law and Economics into the equation and suggests, apparently with careful thought, (and the court's respect for the clarity of the opinion assures the court that is the case) that incapacitation may, by imprisoning Mr. Jackson, "simply make a career in crime more attractive to someone else.... who now faces reduced competition in the crime 'market.'" *Id.* at 1199. Unless, of course, deterrence works, a proposition the concurring opinion finds possible but speculative. Taking the suggestion to heart, the court is deeply concerned that by sentencing Mr. Jackson to prison it may have seduced some irresolute person into the bank robbery "market."

The concurring opinion says of deterrence "it was not mentioned by the District Judge." *Id.* at 1199. This in spite of the pre-sentencing report, which the court considered that specifically incorporated deterrence, and in spite of the court's statement during sentencing that:

"One of the things that I think the Congress of the United States has firmly decided is to in fact say, 'Well, we are not going to pass firearms control legislation, but we are surely going to deter the misuse of them by providing within the criminal, federal criminal justice system for serious sentences for the people who do it in order to deter it from happening, and they're giving the federal judges the responsibility of seeing to it that that legislative message is effected within the court system.'

2. The court notes for purposes of clarity that it sentenced Mr. Jackson not only for the crime of bank robbery, but for two additional crimes as well. Although those additional crimes are, practically speaking, enhancements to the un-

derlying bank robbery, they carry their own sentencing provisions and, in the case of the crime charged in Count 2, the sentence is mandatory, and must be served *consecutively* to that imposed for the underlying crime.

I feel that very, very strongly, that I have a responsibility to see to it that the people's preference as represented by the people in Congress on this issue is carried out."
App. 1527.

The concurring opinion goes on to speculate whether a life sentence for bank robbery would deter many 35 year olds from robbing banks any more than would a twenty year sentence. *Id.* at 1199. The court is sure that the Judge is not suggesting a principle of lesser sentences for older men and equally sure that the concurring opinion misses the elements of the sentence by emphasizing the bank robbery whereas, the sentence of life in prison on Count Three was imposed because of Mr. Jackson's possession of a gun during the bank robbery, and because this was not the first time he had done so.[3]

The appropriate question is whether a life sentence for using a gun after a record of violent crime will serve "pour encourager les autres" who consider doing the same—even if it merely sends them to the "market" for non-violent crime, instead of some other, more legitimate "market".

In concentrating on the issue of bank robberies from an economic standpoint, the concurring opinion notes that the gains from such crimes are slight. *Id.* at 1199. The concurring opinion points out that in 1986 the average "take" from a bank robbery was $2,664, *Id.* It doesn't point out that bank robberies were ten times more lucrative that year than other robberies, or that the successive "takes" of this defendant were many thousands more than the average. FBI, Uniform Crime Reports 20, 18 (1986). Many bank robbers are 'green'

and scared note-passers—Mr. Jackson was neither.

If, as the concurring opinion points out, the average punishment for bank robbery (without enhancement) is something more than 13 years, 835 F.2d at 1200, then one wonders why 20 (the minimum possible including required enhancements) would be the right number of years for this incorrigible and hostile recidivist.

The concurring opinion never touches the problem of the possession of guns by violent felons although that is what underlies this sentence. The court feels, however, that the passage of time and the opportunity to think has given it some considerations on the sentence which it has not previously mentioned. For this the court owes thanks to the clarity and dispassionate treatment of the majority opinion and to the memorandum of the defendant in support of his motion.

■ As the court's extensive discussion above demonstrates, three considerations are predominant in its consideration of the propriety of the sentence it imposed upon Mr. Jackson: First, Mr. Jackson has a long and compelling history of armed violence, and has demonstrated neither acceptance of nor remorse for his responsibility for this history. Second, the sentence the court imposed upon Mr. Jackson is most severe. Finally, the court must be concerned with the deterrent effect of Mr. Jackson's sentence on others.

No one disagrees that the law authorized this court to impose the sentence it did. But the court must also ask itself, in light of the severity of the sentence, did justice require it? After long, careful and thorough consideration, this court has concluded that it did.

"I have trouble imagining a more provocative act than a felon's carrying a loaded gun in public view while traveling on public transportation in a crowded city. He is flaunting his defiance of the law. A quarrel with the taxi driver, a jostle by the crowd, a gesture of fear or anger by an onlooker alarmed or indignant at such a display—any of these incidents might have occurred and led to the gun's being fired and killing or wounding someone."

---

**3.** Judge Posner has, more recently, recognized the danger inherent in even the mere possession of a weapon by a convicted felon. See his dissenting opinion in *United States v. Chapple*, 942 F.2d 439, 442 (7th Cir.1991), in which he disagreed with the majority's opinion that "the threat posed by simple possession of a weapon, without more, does not rise to the level of an act that 'by its nature, presented a serious potential risk of physical injury to another.'" and thus did not automatically qualify the defendant for enhancement under the Guidelines (942 F.2d at 443). Judge Posner disagreed, stating that:

Mr. Jackson is a criminal who has shown no desire to amend his ways. Indeed, it is relevant to note (again) that the crime for which this sentence was imposed was committed just *half an hour* after he was released from prison for two prior bank robberies. A severe sentence is thus mandated both as retribution for his crime and, perhaps even more so, because of his recidivism.

Retribution and the prevention of his recidivism, of course, are not the only considerations which have guided this court in imposing Mr. Jackson's sentence. The court has also carefully considered the potential deterrent effect that a harsh sentence will have on other would-be bank-robbers. Judge Posner is correct; no one knows the true deterrent effect of any particular sentence. However, the likelihood that a particular sentence will deter others from committing similar crimes is a consideration which is well established in both the law and literature relating to sentencing.

Finally, the court has considered whether Mr. Jackson has the ability to function outside of prison. He has not demonstrated that ability to date (Mr. Jackson has been in trouble of one kind or another almost constantly since he was 18 years old). Mr. Jackson must be imprisoned (according to the mandates of the statutes which he most recently violated) at least twenty years. He would not be released until he has reached his fifty-fifth birthday. The minimum sentence, however, is not appropriate in this case, in light of Mr. Jackson's long criminal history and complete lack of remorse.

The Sentencing Guidelines currently in effect could yield a sentence of 360 months to life.[4] The minimum sentence under the Guidelines would thus be 30 years, and again, Mr. Jackson's crime and history merit more than the minimum sentence.

---

4. As Judge Easterbrook noted, Mr. Jackson would be sentenced pursuant to § 4B1.1 of the Guidelines. 835 F.2d at 1197. His Guideline range would be based upon his "offense statutory maximum", but that standard is unclear where, as here, Mr. Jackson was convicted of three offenses—the bank robbery, possession of a gun and use of a gun. The court noted that

Under any of the sentencing schemes set forth above, Mr. Jackson will spend the majority of the remainder of his life in prison. The court does not believe that Mr. Jackson has now, nor will he when he is 75 or 80 years old, have the skills to function outside of a controlled environment such as a prison.

The court has given Mr. Jackson's sentence deep and careful thought. It has given similar consideration to the various comments made upon the sentence, as discussed above. After having done so, the court nonetheless concludes that the sentence imposed here was appropriate. Accordingly, the court denies Mr. Jackson's motion for reduction of his sentence. The court also notes, however, that if Mr. Jackson maintains a good record in prison, he may at some later date be able to press a successful petition to the true holder of clemency power—the President of the United States.

### Conclusion

Mr. Jackson's motion for reconsideration is denied.

### APPENDIX

IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DWIGHT EUGENE JACKSON,
Defendant.

Docket No. 86 CR 426

Chicago, Illinois,
February 18, 1987,
10:00 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE
BRIAN BARNETT DUFF

the Guidelines were ambiguous on the interplay of the bank robbery and Armed Career Criminal statutes. This court would interpret the Guidelines to require the court to sentence Mr. Jackson pursuant to the maximum possible sentence permitted by statute, that is, the Armed Career Criminal statute. That would yield a Guideline range of 37, or a sentence of 360 months to life.

PRESENT:

For the Government: William Hogan (Assistant United States Attorney, 219 South Dearborn Street, Chicago, Illinois 60604).

For the Defendant: Gregory J. Schlesinger (180 North LaSalle Street, Chicago, Illinois 60601).

Court Reporter: Lois A. LaCorte, 219 South Dearborn, Chicago, Illinois 60604.

THE CLERK: 86 CR 426, United States v. Dwight Jackson for sentencing.

MR. HOGAN: Good morning, your Honor, William Hogan and James Zuba on behalf of the United States.

MR. SCHLESINGER: Gregory Schlesinger on behalf of the defendant, your Honor, who stands before the Court.

THE COURT: And the probation officer is present in court.

MR. USATUCK: Yes, your Honor, Al Usatuck, U.S. Probation and Parole.

THE COURT: Now, on January 2nd, 1987, the defendant was found guilty by a jury to the charge of bank robbery in Count 1, violation of 18 USC 2113(a) and (d), use of a firearm during the commission of a crime of violence, one count, in violation of 18 USC 924(c), and being an armed career criminal in possession of a firearm, one count, in violation of 18 USC Appendix II, 1202(a).

A presentence investigation was ordered at that time with the sentencing date set for today before me. I have received a copy of the presentence investigation, and I have read it, and would like to know for the record first, Mr. Schlesinger, have you read the presentence investigation?

MR. SCHLESINGER: I have, your Honor.

THE COURT: Are there any errors or omissions that you think need to be noted?

MR. SCHLESINGER: I find no substantial errors or omissions. I would also indicate that I read the presentence with the defendant and it's my belief that he finds no substantial errors or omissions.

THE COURT: I believe that I am required to get that assurance from Mr. Jackson on the record, so although I'm quite confident that you have fulfilled your duties in that regard, I'll have to ask Mr. Jackson too.

Mr. Jackson, have you read the presentence investigation?

DEFENDANT JACKSON: Yes, I did.

THE COURT: And do you think there are any changes that need to be made?

DEFENDANT JACKSON: No.

THE COURT: All right. Mr. Hogan—

MR. HOGAN: Yes, your Honor.

THE COURT: —have you read the presentence investigation?

MR. HOGAN: I have, your Honor.

THE COURT: Does the Government feel there are any errors or omissions?

MR. HOGAN: No, your Honor.

THE COURT: My procedure Mr. Jackson, so you will understand, is invariable. I do every sentencing the same way, because I consider it a very difficult and important time for you and for everybody involved, and so what I do is I will ask your attorney if he wants to offer any evidence by way of mitigation.

Now, "mitigation" means to suggest a lessening of the offense or of the punishment. And then I'll ask Mr. Hogan for the Government if he wants to offer any evidence by way of aggravation. "Aggravation" means to enhance or make stronger or to suggest a greater penalty. And then I'll ask Mr. Schlesinger if he wants to argue in mitigation, and then I'll ask Mr. Hogan if he wants to argue in aggravation. Then I'll ask you if there is anything you want to say. So you think about that.

And I will listen to you and everything that you want to add to the proceeding, but I do want you to understand everything that takes place here today.

All right. Mr. Schlesinger, is there anything that you would wish to offer by way of evidence in mitigation?

MR. SCHLESINGER: Nothing by way of evidence, your Honor.

THE COURT: Mr. Hogan?

MR. HOGAN: No, your Honor.

THE COURT: All right, Mr. Schlesinger, would you like to argue in mitigation?

MR. SCHLESINGER: Yes, Judge.

Your Honor, I have reviewed the presentence report with the defendant and I know the Court has examined it in great detail, and I'm in the somewhat unusual situation that I also have some years of personal experience in representing this particular defendant, and perhaps have more personal familiarity with him than many defense attorneys have with their clients.

As to his personal background, he is a 35 year old man, was born in Houston, Texas, as the presentence report reflects. His parents separated when he was nine months old, and throughout his youth apparently he lived from time to time with various of his relatives, predominantly with his mother, who I might point out is here in open court today, and as the Court knows, was present throughout his trial and I believe evidences a concern for her son that's been apparent throughout his life.

The presentence report reflects, and I agree, that some or at least many or perhaps only some of the defendant's problems were as a result of problems within his family as he grew up, the lack of a stable father figure, which Mr. Usatuck points to, and permissiveness and indulgence on the part of various relatives within the family who were responsible for raising the Defendant.

But I do believe that there is a concern for him on the part of his family, his mother, his grandmother and others in his family, and I bring that to the Court's attention.

In 1968 the Defendant joined the army and I think that his service should be noted. I think also that certain problems with regard to his personality were exascerbated by his period of time in service, and I think that his experience in service and in Viet Nam was not a good one. I think that circumstances which arose during the course of his service did not serve him well.

As to his educational background, he has had two years of high school education and on two separate occasions has made efforts to improve himself through further education, in 1970 attended business college in Houston, Texas, and in 1977, on both of these occasions after having served in the army, attended the Academy of Arts College in San Francisco for approximately a year.

His employment history after his discharge from the service in my opinion does indicate an effort on his part through the 1970's and into 1980 to be gainfully employed.

In 1971 and 1972 he was employed as a security guard at Cambridge YMCA. Between 1972 and 1974, he worked with the Inner City Polaroid Company. In 1975 he worked at Gage Ford. In '76 and '77 he was employed by the Polaroid Company, and between 1978 and 1980 he was employed by Interlake Steel.

As to his criminal background, it is extensive. It is—the presentence is very detailed as to the defendant's criminal background, and, of course, no one who has any concern for the criminal justice system would suggest to this court that the defendant's criminal background must not be taken into consideration and could not be taken into consideration in shaping an appropriate sentence in this case.

However, I think there are aspects of the defendant's criminal background which should be noted and considered even as a defense attorney on behalf of the defendant. Predominantly, I refer to the fact that there is a, in my opinion a complete lack of any sort of gratituous violence on the part of the defendant, any sort of intent, direct intent to inflict injury, personal injury on individuals, any willingness to engage in the type of conduct that I see reflected in the cases which the Government has brought forward this morning and which it is citing to the Court.

Judge, if I may, I will assume that the Court has had an opportunity to read the case that the Government submitted and I would address myself to that particular case.

THE COURT: Certainly.

MR. SCHLESINGER: Judge, I think that this case is inappropriate for consideration by the Court in terms of sentencing here today, and I think there are a number of reasons for that.

First, factually—and the Government has also tendered to me another case—I don't know whether it's their intention to supply that to the Court or not. That case is United States v. Gwaltney.

THE COURT: They have submitted that to me.

MR. SCHLESINGER: I have had a brief opportunity to review that as well, and if I may, I will address myself to both these cases, the first being United States v. O'Driscoll and the other being United States v. Gwaltney.

Now, O'Driscoll, as I read it, involved a kidnapping and an armed robbery, a situation in which a defendant in the course of the robbery and the beating inflicted horrible injuries on a victim, including cracked teeth, broken fingers, a left ear, which by the description of the court, was half torn off, threats of death, and subsequently took a hostage from the state of Kansas to the state of Colorado, an individual that was involved in apparently a murder investigation or at least was in possession of a murder weapon, an individual who had been involved in the kidnapping of a 68 year old woman and apparently at the time of sentencing had 71 charges in seven different courts pending against him, and, of course, the district court and the Court of Appeals in that case focused on the viciousness—their comment—the viciousness of this person's conduct, his attitudes and propensities, and I think that was the rationale and, of course, the cogent reasoning of the district court and the Court of Appeals in fashioning a sentence for that particular defendant.

As to the Gwaltney case, it's my brief reading of that case that this involved a situation in which a woman was abducted, handcuffed, raped, and subsequently shot in the head and murdered, and although the case was tried in federal court, that was the essence of the criminal conduct of the particular defendant.

And again, the court in shaping a sentence appropriate to that particular defendant and that particular crime focused on the viciousness and the wanton cruelty of that particular defendant.

I believe for that reason alone these cases are inappropriate for the Government even to suggest to the Court as authority for sentencing in this case. I think there are statutory reasons why these cases are inappropriate and that—I assume that the Government is offering these cases in connection with 18 USC Appendix II, 1202(a), which is the possession of a firearm by an armed career criminal conviction.

The other statutes, of course, have fixed mandatory maximums—or fixed maximums, excuse me. The Armed Career Criminal possession statute has a fixed minimum, contrary to the kidnapping statute alluded to by the Court in O'Driscoll, does not make any reference to life imprisonment or even suggest that life imprisonment or a sentence such as the one that was fashioned in O'Driscoll is to be recognized under the statute.

I would point out to the Court that the appendix and the statute in the appendix is one for possession of a firearm. Obviously, Congress expressed a clear intent to impose a very harsh sentence for those individuals who had previously been convicted of multiple offenses and who are found to be in possession of a firearm, and they did that by fixing a 15 year minimum sentence, which by my reading is not one which is subject to the parole provisions of 18 USC 4205.

Therefore, I think these cases, the cases that the Government has cited this morning, are also inappropriate—

THE COURT: Mr. Schlesinger, you say that that's not subject to the parole provisions?

MR. SCHLESINGER: That's my reading, your Honor.

THE COURT: Now, the parole provisions have a mandate of a parole hearing at ten years.

MR. SCHLESINGER: Yes.

THE COURT: The statute says there can be no probation or parole for a minimum of fifteen years. Isn't that contradictory in its terms?

MR. SCHLESINGER: Well, I think that 4205 says also, your Honor, that the parole provisions are applicable except to the extent otherwise provided by law.

THE COURT: Well, Mr. Schlesinger, isn't it then arguable that since there is no maximum under that statute that I could sentence him to prison for life?

MR. SCHLESINGER: It is arguable, Judge. There is no question that it's—by my reading of the statute it does not set a fixed maximum term.

THE COURT: And according then, if that's true and if Mr. Hogan's argument is true, I could send him to jail for life without parole.

MR. SCHLESINGER: Could you do that, Judge?

THE COURT: I'm asking.

MR. SCHLESINGER: I believe that such a sentence would not be lawful by my reading of the statute.

THE COURT: Which statute?

MR. SCHLESINGER: The statute, the Armed Career Criminal statute and by my reading of case law as to appropriate sentencing. Of course, I can't say that there is a specific maximum included in the statute, there isn't, but I don't believe that such a sentence would be lawful, in my reading of case law and sentencing, even these cases.

THE COURT: Okay.

MR. SCHLESINGER: Just one final comment on the statute, Judge, and that is that 4205, after talking about the eligibility for parole and the one-third provision, specifically says that that section is not applicable in those situations where the law otherwise provides.

The exact language is, "except to the extent otherwise provided by law," and I would suggest to the Court that in the appendix, in 1202(a), the possession of firearm statute, there is a specific exception and that specific exception says that there will be no parole consideration, there will be no parole for the minimum mandatory period, so that there is a specific exception which would obviate the parole provisions in sentencing on that particular count.

THE COURT: Well, that doesn't seem to be a logical syllogism. The one doesn't deny the other. If one would say that you could sentence somebody to a long sentence and this is an indeterminate statute in terms of the length of the sentence, and it says that there would be no parole allowed at least for the first fifteen years, it doesn't say that there should then automatically be parole allowed for anything in excess of that, does it?

MR. SCHLESINGER: That's correct, Judge, but I think what the statute says is that the person shall be imprisoned for not less than fifteen years, and that with respect to the conviction, the person shall not be eligible for parole with respect to the sentence imposed by the Court, so that it's my belief that the intent of Congress in this section was to set a fixed term of years, no less than 15 years, which would not be subject to the parole provisions. That's my reading of the statute.

THE COURT: Okay.

MR. SCHLESINGER: Judge, I think that the Court having great experience with regard to the sentencing of criminal defendants recognizes that there are a number of important purposes in fashioning a sentence. Of course, punishment or retribution is a clearly recognized consideration. Deterrence is another consideration. Rehabilitation is another consideration.

But one consideration that many people outside criminal justice don't often take note of, I think, is the actual incapacitation of the individual involved.

When people ask why do we send a burglar to the penitentiary for three years when it's not going to help him and it's not going to deter anyone else or it may not

really directly offer any retribution, one reason is that that person is incapacitated, he will not be committing burglaries for the three years or the drug dealer that's sent to the penitentiary will not be selling drugs for at least a certain period of time, and whatever sentence the Court imposes here I think will serve to incapacitate Mr. Jackson and make it impossible for him to commit any crimes through basically the majority of his adult life.

And I think as another wise judge in the state court system once pointed out, age is a very significant factor in making it impossible for certain individuals to commit crimes. Things that people can do as young people they cannot do as older people.

THE COURT: Who was that sage?

MR. SCHLESINGER: That was Judge Collins, your Honor.

What I'm trying to suggest, your Honor, is that I don't believe that there is a reason to consider the type of sentence that the Government is proposing in this case.

I don't believe that based on the nature of these offenses—and I don't deprecate the seriousness of these offenses, these are serious felony offenses, the defendant's background is one of serious felony offenses—but it is not one of the type of wanton gratituous violence that this attorney has seen, that this court has seen, and that I assume the Government has seen that calls for the kind of sentence that's discussed in these particular cases.

If we are to treat those offenses with the severity that they deserve, the infliction of injury on other people, I don't think we should impose that type of sentence for the possession of a weapon, which is basically what the court would be doing.

I would point out to the Court that in my experience with this defendant he has not only not inflicted serious injury on others, in some situations I believe he has avoided the possibility of inflicting injury on others by flight.

In 1980, the presentence report reflects that in flight from a crime, rather than confrontation with those that were attempting to arrest him or attempting to inflict injuries on others, he caused himself very serious injury. In the course of flight he had a car accident which threatened his own life.

And as Judge Grady points out, of course, it is fortuitous to a great extent that no one has been injured, but it is a fact and I don't believe there has been any effort on the part of this individual to harm others in the sense of inflicting violence upon them.

The presentence report also reflects in 1986 an attempt at suicide on the part of this defendant, that the presentence suggests is at least by the defendant's version, reflective of his awareness of these particular charges.

There are long-standing and deep psychological problems that are alluded to buy the presentence report that will not go away, Judge, and of course, will not go away at least during the passage of this particular sentence.

But if there is one comment I can make, it is that I do not believe that the type of sentence that the Government is requesting is one that complies with the nature of this particular individual or these particular offenses.

Finally, Judge, on a technical point, the Defendant has asked that I ask the Court to consider allowing him to remain within the confines of the Metropolitan Correctional Center for thirty days after the imposition of sentence. And that's all I have.

Thank you.

THE COURT: Why the latter request?

MR. SCHLESINGER: He has some matters, family matters, also some legal matters apparently that could best be resolved here in Chicago.

THE COURT: Doesn't he have two other matters pending someplace?

MR. SCHLESINGER: I don't believe there are any matters pending. At least if they are, I'm not aware of them.

MR. HOGAN: There are no other matters pending presently, your Honor, that I'm aware of. I'll address that aspect.

THE COURT: Are you finished then, Mr. Schlesinger?

MR. SCHLESINGER: I am, Judge.

THE COURT: All right.

THE COURT: Mr. Hogan.

MR. HOGAN: I'm not going to go through the facts in great detail, your Honor.

THE COURT: The facts of the trial?

MR. HOGAN: I don't need—the Court tried the case. They're set out in the presentence report at some length. I think that the presentence report also explicates in some considerable detail Mr. Jackson's horrendous history. He is simply an armed career bank robber who uses a weapon or feigns the use of a weapon.

He has three prior armed robbery convictions. This one is his fourth.

THE COURT: Excuse me, he has four prior armed robbery convictions.

MR. HOGAN: This particular one is his fourth armed robbery.

THE COURT: Fifth.

MR. HOGAN: The two cases that were tried before Judge Grady.

THE COURT: Oh, they were—

MR. HOGAN: He feigned the use of a weapon.

THE COURT: One of them he used a note that said, "I have a gun," and the other one he just had his hand in his pocket or a gun in his pocket.

MR. HOGAN: That's correct, your Honor. There is no gun displayed, is what I'm trying to say. There is no question that this is at least the fourth time this man has used a weapon.

THE COURT: By my count this is only the third time that a weapon was seen.

MR. HOGAN: There was one when he was in his early 20's in Massachusetts.

THE COURT: It wasn't a bank. I'm sorry, I thought you said a bank. Yes, this is his fourth armed robbery where a gun was seen, if you count the one that happened when he was 21.

MR. HOGAN: 21 in Massachusetts.

THE COURT: That was a store, though.

MR. HOGAN: Yes, your Honor. It is indeed fortuitous that nobody has been shot. I suggest that based on the number of times that he has been in a situation that has extreme potential for violence that it borders on the miraculous that nobody has been shot at this point, including this defendant.

He has been involved in high speed escapes. He has been in a position where he has been arrested with a weapon in his car as he was ordered to emerge from the car by the FBI agents in this case.

There was some suggestion that had he actually been the person who robbed the bank, he may have pulled the weapon and used it in a shootout.

I believe that Mr. Schlesinger argued that to some extent before the jury in this case. I only suggest it's extremely fortunate that that did not occur because there were not only FBI agents and police officers, but there were other citizens on the street at the time that Mr. Jackson was arrested.

I think that his criminal background and his propensity or potentiality for violence speaks eloquently for itself and I don't need to dwell on any more particulars on it.

What I think is very interesting in this case is that he up until this very moment standing before this court denies committing this crime. His version of the offense as set forth in the presentence is this was all a setup by federal agents and federal correctional authorities presumably because they realized he had a history of this nature and there were armed bank robberies being committed in the western suburbs of Chicago during the period of time he was on work release at the MCC; therefore, they fastened upon him and set him up for this frame.

I think even to state that position reflects its absolute ridiculousness. I think the evidence in this case was overwhelming

that Mr. Jackson did in fact perpetrate the crime for which he stands before this court convicted.

In addition, with regard to what the Court raised obliquely regarding other unresolved matters, I'll address myself to them at this point. I have not referred in my version of the offense to uncharged crimes or to other crimes for which this defendant is a suspect because I don't want the Court to take them into consideration in sentencing.

However, I do think it's appropriate to at least mention them in passing.

MR. SCHLESINGER: Judge, I object to that. If counsel truly doesn't want you to take them into consideration, the best way for him to do that is not to make any mention of them.

MR. HOGAN: In fact, I was not going to until the Court raised them. I don't know if that's what you had in mind.

THE COURT: You don't need to say anything at all. Anything pending would be insignificant in terms of what the record reflects.

MR. HOGAN: Officially, there is nothing pending against this defendant other than for what he stands convicted of.

Now, with regard to the legality or illegality of the sentence here or the propriety of the sentencing in this case pursuant to the statutes for which Mr. Jackson is convicted, my reading of the statutes is that under the Armed Career Criminal provision this Court has the authority to sentence Mr. Jackson to life imprisonment without parole, period. I don't think that there is any minimum period for which he is ineligible for parole, as Mr. Schlesinger suggested or seemed to suggest.

My understanding of what Mr. Schlesinger argued was that the fifteen year term in 1202(a), which says that that shall be the minimum term provided, somehow implies that that is the maximum term for which he is ineligible for parole.

I suggest that a plain reading of the statute does not at all support that argu-

ment and that there is nothing in the legislative history that I'm aware of that supports that argument. There is little or no case law that I'm aware of regarding the maximum to which a defendant may be sentenced under that provision.

THE COURT: I am not sure of this, but I have some sense that the first person that was ever sentenced under this new statute was sentenced by me last year.

MR. HOGAN: I'm aware that this Court did—

THE COURT: So there aren't very many cases since then that possibly could have gone upstairs.

MR. HOGAN: That's correct. I'm talking about not only this circuit, but nationwide.

THE COURT: I am, too.

MR. HOGAN: I have checked with the Department of Justice and the case law on the sentencing aspects of this statute is extremely scanty and there is nothing—

THE COURT: I think the case law on this statute is scanty.

Are there any cases yet at all on it?

MR. HOGAN: Not on the sentencing aspects.

THE COURT: On anything.

MR. HOGAN: There is a case on—I think there are cases—I'm trying to think exactly.

Oh, I know what it is. There are two separate cases from two separate circuits that describe whether it's appropriate that the jury learn of the three prior felony convictions. I think that we addressed that issue in our pretrial discussions in this case and the Court accepted the fact that as elements of this offense the jury needed to be told that we had to prove three prior felony convictions, and we did in fact do that in this case, so that's the only case law I'm aware of.

There is a Fourth Circuit case. I think the name of it is Davis. I just don't recall. That's what it deals with. Other than that, I would say that the plain language of the statute allows this court to sentence this defendant under that section to natural life

imprisonment without the possibility of parole, and as I urged in my presentence version, that is what I suggest this Court do.

In addition, the 924(c) count requires a minimum mandatory—or excuse me, a maximum set sentence of five years imprisonment for the use of the weapon that was employed in this case, again, without the possibility of parole. That sentence must be consecutive to any other imposed.

THE COURT: Say that again.

MR. HOGAN: The 924(c) count, the use of a weapon, charged in Count 2 in this case is a five year mandatory, no parole.

THE COURT: And it has to be consecutive?

MR. HOGAN: Has to be consecutive to anything else, including the way I read it, the 1202(a) count, and also to the sentence under Count 1, which is an armed bank robbery count, which provides for a maximum of 25 years.

So there are a variety of sentences that this court could impose. It could impose life without possibility of parole under 1202(a). It could also run consecutive to that the sentence for armed bank robbery, 25 years, and consecutive to that the sentence for the 924(c) counts.

Now, the reason that I provided O'Driscoll is not specifically—the case that I provided the Court this morning was not specifically to urge that this Court sentence on the basis that was employed in the O'Driscoll case. It was more for informational purposes regarding potential sentences that have been approved in crimes by defendants with similar backgrounds and that extremely severe sentences of terms of years with minimum parole eligibility requirements pursuant to Section 402(b)(1) have been specifically approved by other circuits. I'm unaware of any case law in this circuit.

I would suggest that the plain language of 1202 eliminates the necessity for this court to prescribe a minimum one-third eligibility term, but I suggest that the O'Driscoll case certainly supports the Govern-ment's position that this defendant should be—

THE COURT: Wait, you said "proscribe" or "prescribe"?

MR. HOGAN: Prescribe.

THE COURT: So you feel that I don't even need to say, if I sentence under 1202, any reference at all to the parole.

MR. HOGAN: My reading of the 1202(a) statute is that any sentence that you give has no possibility of parole, that's correct. There is no parole eligibility.

THE COURT: Just a minute. We are looking now at Appendix II, right?

MR. HOGAN: Yes, your Honor. I honestly cannot answer for this Court what impact the defendant's good time is going to have in this case were he to get a life sentence without parole. I have spoken to a member of the Parole Commission, a case analyst in St. Louis at the regional headquarters, and asked him for an opinion as to how that would factor in, and he couldn't give me one.

I know he is going to be eligible for some accumulation of good time, but I honestly have no idea if he is not eligible for parole what benefit that good time accumulation has, so I'm not sure that that's an issue. It's just a factor that I'm aware of that I wanted to bring forth for the Court here. The prior sentences that this defendant has received have been relative lenient.

First of all, from Judge Crowley he got eighteen months with five years probation.

THE COURT: Excuse me, I'm going to ask Mr. Schlesinger to respond to one thing, but I want him to hear it now before you finish.

In the 1202, Mr. Schlesinger, the last part of the sentence under (c), Receipt, Possession, or Transportation of Firearms, penalties for violation, says in part—and I'm going to sort of edit it as I read it—"In the case of a person who receives, possesses, or transports in commerce or affecting commerce any firearm and who has three previous convictions by any court referred to in Paragraph 1 of this subsection for robbery or burglary or both, such person

shall"—and it speaks of—well, I'll read it— "shall be fined not less than $25,000—

MR. SCHLESINGER: Excuse me, not more.

THE COURT: I said "not more than $25,000 and imprisoned not less than fifteen years," and underlined, "notwithstanding any other provision of law, the Court shall not suspend the sentence or grant a probationary sentence to such person with respect to the conviction under the subsection," and now underlining the remainder of the sentence, "and such person shall not be eligible for parole with respect to the sentence imposed under this subsection."

It sounds to me like Mr. Hogan is correct that there is no parole under a sentence under 1202.

MR. SCHLESINGER: Shall I respond now, Judge?

THE COURT: No, I want to let Mr. Hogan finish, but I certainly do want you to respond because it's a very important issue.

Okay, Mr. Hogan, you can continue, and if you would like my copy of the statutes, Mr. Schlesinger, you can take them.

MR. SCHLESINGER: No, we have them here, Judge, thank you.

THE COURT: Go ahead.

MR. HOGAN: 4205(a), your Honor, provides that for a person serving a term of years of life—for life or any term in excess of thirty years becomes eligible for parole after ten years except as otherwise provided by law.

It's my reading of that latter clause in 4205(a) except to the extent otherwise provided by law, that the proscription of eligibility under 1202 means that this defendant, were he to get a sentence of life, is never eligible for parole.

Now, I would suggest that this defendant's extensive criminal history mandates that he be incapacitated for the rest of his natural life so that he doesn't kill somebody in the course of an armed bank robbery. I think that the deterrent effect on this particular defendant and the retribution consideration mandate that this person be sentenced to jail forever, basically until he dies.

This is not simply, as Mr. Schlesinger suggests, sentencing for carrying a weapon. This provision under 1202(a) is a specific statement by the Congress of the United States that severe recidivist criminals such exactly as this defendant standing before you need to be incapacitated, and it's a grant of the specific authority for this court to bypass all the other parole provisions, all other sentencing criteria which we normally apply and to take the prior history of severe felony repeat offenders into consideration and deliberately incapacitate them forever, and that is what I think this defendant's criminal history requires in this case, and that is what I request this court to do.

Thank you.

THE COURT: Mr. Schlesinger, I'll give you an opportunity to respond, which I usually don't do, but because of the legal character of the argument I would be happy to hear from you.

MR. SCHLESINGER: Well, Judge, just to respond on the question of this particular statute and the parole provision—

THE COURT: All right.

MR. SCHLESINGER:—I had thought when the Government first began that the reason they gave you these cases is because they thought they were somehow applicable and they were discussing the length of the sentence and the concept of parole, because these cases do discuss fashioning a sentence in light of Section 4205, the parole provision.

What I had said—

THE COURT: Before you go further, let me make a comment on that. It's my impression—if you will recall, during the course of the trial I chided Mr. Hogan more than once on not giving me the cases to read in advance. I think he was well-advised, if he was going to have an issue of law to discuss with me today, that he was well-advised to give me these cases in advance and to give them to you in advance, which he did. I don't find that offensive.

By the same token, he should not be telling me what I should sentence, and so I accept the cases for the purposes of the law, rather than the argument of sentence because I think that would be improper for Mr. Hogan to do and I wouldn't accept it anyway.

I do accept the cases in terms of how they might illuminate the case, illuminate the law, and illuminate this discussion.

With that in mind, I do want you to respond.

MR. SCHLESINGER: All I would like to respond to, Judge, at this point is the question of the legality of the very sentences that he discussed, and I think what I said to the Court was it's my reading of this added statute, this appendix, this recent addition to the criminal law, that the Congress did intend to set a fixed term of incarceration no less than fifteen years without the possibility of parole. I think that's very clear in the statute. I think that's what I had initially suggested to the Court that I believe—I had thought when the Government first addressed the issue they were concerned about the possibility of parole, in light of these two particular cases, which also discuss a sentence to be fashioned so as to avoid one-third parole within a short period of time, and by "short" I mean ten years or something of that nature.

I agree with the Government. By my reading of the statute this is a statute that calls for and gives the Court the opportunity to set a sentence and avoid the possibility of parole and that it was the intent of Congress in connection with those individuals who had previously been convicted of multiple offenses that the court be given that power and that certain powers, in other words, a sentence of less than fifteen years should be taken away from the district courts. I think that's what this statute does.

This Court could not sentence the defendant to five years or ten years or fourteen years, but I believe that by setting a fixed mandatory minimum the concept is that the court will impose a sentence that is deter-minate, very determinate, no parole, not less than fifteen years, and of a fixed duration.

And finally, Judge, if this is a statute, regardless of what we say about it and regardless of its importance and, of course, it is important in the administration of justice, but it is a statute for the possession, transportation, or receipt of firearms, and to the extent that there is case law on this statute—and we did have some discussion before the trial as to the case law on the statute, which I agree with the Government is very limited. There are cases that point out, it's my belief, that this is a possession statute which will be generally brought in connection with other charges, armed bank robbery or the use of a weapon, as was done in this case, and I think the sentencing that is to be imposed, the sentence that's to be imposed under this statute is one that is generally a sentence that will be in addition to sentences for other crimes.

So I don't believe that—although I agree with the Court there is no reference to a maximum period of time, I don't believe that this statute warrants or this defendant's background warrants a quote, unquote, life sentence, as the Government suggests.

I don't think there is any specific reference to that in this statute as there are in other statutes. The Court has the O'Driscoll case before it where there is reference to the possibility of a life sentence.

That's really what I have at this time, Judge.

THE COURT: All right.

Mr. Jackson, would you like to have anything to say to the Court?

DEFENDANT JACKSON: No, I don't have anything to say.

THE COURT: All right.

THE COURT: Well, Mr. Jackson, I think that perhaps in the course of human affairs one of the most difficult things that can ever happen to a human being is that moment in time in which he stands before any tribunal for punishment, particularly when that punishment can be very severe, and as

one human being to another, I understand the difficulties that you are under right now.

I would also say to you that one of the most difficult times that any person, informed or sensitive, can have is the difficulty of sentencing another human being, because we are not gods with all of the wisdom of the ages. We are human beings. So we just do the very best we can.

I also feel, however, that as a Judge to a convicted felon, my responsibility to you includes the roles that you and I have played in society and I have a responsibility to address these statutes which I'm sworn to uphold and to do the very best I can in applying them to this set of circumstances.

And I'm very sorry to say that in your situation I find the necessity of severe punishment to be mandated in terms of my sense of responsibility to society and the oath that I carry out.

You had a trial by a jury, a very good trial, very well tried. Your attorney did an excellent job. The Government's attorney did an excellent job. All of the witnesses were provided for that needed to be provided for, and in spite of some misunderstanding on the part of at least one reporter, everybody was here who was supposed to be here.

Your attorney was given the opportunity to bring in any witness that he wanted to and use the power of the court to accomplish that. All of the time was given for the inquiry and the investigation. No examination was cut short, and the jury deliberated fairly and at sufficient length to resolve the matter and they found you guilty of these three counts.

The criminal justice system under the United States laws has functioned up to this point in my opinion as it should.

Mr. Schlesinger argues well, given his particular knowledge of you. It's quite clear that he understands you and has argued as strongly as he can, given the facts he has to argue with in your behalf.

The simple truth of the matter is, Mr. Jackson, you're a dangerous man. I think—and not without some considerable experience in these respects—I think you're a very dangerous man. I think, sir, that you're a walking murder, whether it be yours or some bank guard's or some teller or some citizen that gets in your way as you flee.

Mr. Schlesinger suggests that it was perhaps courage that caused you not to hurt somebody when you were fleeing if your own behalf. I think maybe it was cowardice, but whether it was or it wasn't, I give very little consideration to the fact that you didn't hurt somebody. I don't give you any "brownies" at all for not having hurt somebody.

I think it's quite clear that you have been convicted repeatedly. You haven't learned a thing. The very first instance you were given reform school in Massachusetts at the age of 21, one and a half months, then a halfway house for armed robbery and unlawfully carrying a firearm.

You had a lawyer. You were given probation. And then you got in an argument with a police officer in Boston again, got arrested, taken to the police station, had a lawyer again. It isn't a conviction because it was dismissed, but you were arrested for armed robbery again at the age of 21, and the charges were dropped. Innocent as you are presumed to be in that instance, you surely should have learned something by that arrest.

Then you were committed to the custody of the Attorney General for 25 years in 1977, but the parole board saw fit to let you out.

MR. HOGAN: Your Honor, I don't mean to interrupt, but on that case—

THE COURT: That was the observation and study, I'm sorry. Well, that's right, that isn't a real sentence because they have to do that in order to have the time to study you.

The remainder of your sentence, you got five years probation and you got credit for time served.

Those two offenses, on one you displayed a revolver in your right hand and in the other the pistol was seen by the teller, and

you did in fact have a loaded .32 caliber revolver on your person. Judge Grady gave you eight years custody of the Attorney General in 1980. You obviously didn't serve all that.

Judge Crowley on a probation revocation gave you ten years custody of the Attorney General and you didn't serve all that.

And I think that one of the reasons the legislature has given the courts the opportunity on some kinds of crime, for very specific kinds of crime, is number one, that it seems to me the courts are the ones to whom the public looks for the responsibility of sentencing. They don't know the parole office let you out early and they're looking to the courts constantly to see why people who commit serious crimes are back on the street before, so to speak, the matter seems to have even died down.

I'm very concerned and I think that this statute has very clear language. When I was in the business of making statutes some fifteen years ago I always fought hard against mandatory sentences. I don't think judges should be given mandatory sentences. The reason they are is some congressmen or legislators believe that they can do the sentencing from the Capitol building, the halls of the Capitol, and so they take away the flexibility from the judges.

In this instance they have given the judges flexibility, but they have also allowed very serious sentences and I think they're looking to the judges to see if indeed they're taking the responsibility as they should in each instance.

I'm thinking of all these things as I'm trying to decide what the right thing to do with you is. You stand here before me, and according to the presentence report you still deny that you did anything.

I listened to the trial. I don't think there is any question at all not only did the FBI do an almost heroic job of apprehending you rapidly while the gun was still in your possession and doing it in a way that maintained safety for themselves, yourself, and the people around you. If they had been a little more itchy-fingered, you might be dead today.

The citizen who took upon herself the responsibility of noting the circumstance in the parking lot of the bank is a person to be greatly admired. We should have more people involve themselves in society than that.

And your crime was a calculated one. You very carefully figured out how you could get there adjusting the records or manipulating, if you will, the records of the Metropolitan Correctional Center while you're in the very circumstance of being prepared for release from another crime.

You couldn't wait, Mr. Jackson. You had to go out and get some more money and at the risk of the terror and the fear of a young lady that had to stand there—or man—and look at that .357 Magnum. Big enough to blow a hole the size of a fist through a human being and easily strong enough to make a widow out of the wives of a number of FBI and law enforcement people.

Mr. Schlesinger argues that you haven't been guilty of any gratuitous violence. By your own admission to the probation officer you tried to shoot a colonel in the service, ended up not being charged with that. You knocked off several rounds in the process, didn't hurt anybody, no credit to you that other people grabbed you and put you down.

That's the kind of man you are. You are impulsive. You are not insane. You have been checked out. You're smart, as a matter of fact. You know what you're doing.

But you have got hostilities in you that are profound and deep, and I think Mr. Schlesinger is right. He says these long-standing and deep psychological problems will not go away during the course of the sentence. I guess that suggests that they will be with you maybe forever. You haven't taken any steps to try and do anything about them yourself of any significance or any success.

Mr. Jackson, it's my belief that the people of the United States of America and the people of Illinois are very, very concerned

about the use of handguns in committing crimes. One of the major arguments of our day is the people who feel very strongly that they should have the constitutional right to use firearms to protect themselves, their homes or even for recreation, for hunting, for sport, for competition, and other people who are reasonably and appropriately concerned about the misuse of firearms, particularly within the urban areas, and particularly handguns, and the legislative bodies are constantly beseeched to do something about this problem.

One of the things that I think the Congress of the United States has firmly decided is to in fact say, "Well, we are not going to pass firearms control legislation, but we are surely going to deter the misuse of them by providing within the criminal, federal criminal justice system for serious sentences for the people who do it in order to deter it from happening, and they're giving the federal judges the responsibility of seeing to it that that legislative message is effected within the court system.

I feel that very, very strongly, that I have a responsibility to see to it that the people's preference as represented by the people in Congress on this issue is carried out.

Now, I will tell you that I am among those who had to deal with these problems many years ago and I know the dilemma that the people are confronted with, but you, sir, are one of the worst examples that's come in front of me. You're a career criminal. You're in your mid 30's, 37, 36 years old, and you have been committing crimes since you were a teenager, the ones that we know about.

If you have been caught and convicted of four armed robberies, and six—six robberies, two of them—let's see, four armed robberies, of which two were bank robberies, and two other bank robberies, each of which with intimations of possession of weapons, one of which your note with your own fingerprints on it said, "I have a gun"—Mr. Hogan began points out to me we are not counting that as an armed bank robbery—but I believe your note on this

record. I believe you had a gun. You said you did and you sure did every other time, with the possible exception of once. I have got no reason to believe that you weren't armed all the time.

I have got no reason to believe there weren't times you weren't caught, because you're not that stupid. You're smart. And I don't believe you were caught every single time you have done something wrong, but even if I take that as a fact, you, sir, are a dangerous man, a dangerous career criminal, and I'm sentencing you accordingly.

On Count 1, violation of 18 USC 2113(a) and (d), I'm sentencing you to 25 years.

On Count 3, 18 USC Appendix II, 1202(a), I am sentencing you consecutively to Count 1 to life imprisonment.

On Count 2, I'm sentencing you consecutively to five years.

All right. Now, you have the right to appeal. If you're indigent or become indigent, you have a right to court-appointed counsel if you make your motion and it's allowed.

You have to file your motion within ten days. You should talk to Mr. Schlesinger about it.

The Court enters judgment on the verdict, judgment on the sentence.

MR. HOGAN: Your Honor, there is just one additional matter, if I might. I don't recall—

THE COURT: Excuse me, there is also a mandatory requirement, I believe, of fifty dollars costs on each of the three counts.

MR. HOGAN: I don't recall as I stand here whether the Court denied Mr. Schlesinger's post-trial motions, but for the record I would ask that that be done.

THE COURT: Do you want to argue those at all, Mr. Schlesinger?

MR. SCHLESINGER: I rest on the written motion, Judge.

THE COURT: They're denied.

MR. HOGAN: Thank you, your Honor.

MR. SCHLESINGER: Would the Court consider allowing the Defendant some time here in the MCC?

THE COURT: No, sir.

MR. SCHLESINGER: Thank you, Judge.